# W. L. WAYLAND, Respondent, v. WESTERN LIFE INDEMNITY COMPANY, Appellant.

**Kansas City Court of Appeals, June 17, 1912.**

1. **LIFE INSURANCE: Assessment Company: Forfeiture: Illegal Assessments.** The policy issued to a member by an assessment company cannot be declared forfeited by reason of the failure of the meber to pay assessments illegally levied. The right to assess is strictly construed and it can only be exercised when the conditions prescribed in the contract exist.

2. ————: **Abandonment of Policy: Intention.** The test of an abandonment of rights under a life insurance policy is the existence of an intent to abandon and the presumption is that the owner of property intends to preserve his rights.

3. ————: **Unlawful Assessments: Forfeiture.** Plaintiff was named as one of the beneficiaries in a policy issued to one Wayland who failed to pay two assessments levied in October, 1905. Thereupon his membership was declared forfeited and he made no effort to be reinstated. No notice of any subsequent assessments was given him, and in October 1908, he died. The interest of the other beneficiaries was assigned to plaintiff. The unpaid assessments were made when unnecessary under the provisions of the contract and therefore were illegal and void, furnishing no legal basis for a forfeiture.

4. ————: **Forfeiture: Subsequent Assessments.** The attempted exaction of illegal assessments and the declaration of the insurer that it would not continue in contractual relations with the assured except on his submission constituted a breach of the contract that relieved the assured of the obligation to pay or tender payment of subsequent lawful assessments.

**Ellison, J., Dissenting.**

Appeal from Chariton Circuit Court.—*Hon. John P. Butler,* Judge.

AFFIRMED.

CERTIFIED TO THE SUPREME COURT.

*Thomas J. Graydon, W. M. Williams* and *E. F. Ware* for appellant.

Good faith to his fellow members, who must be assessed to pay his policy if such payment is required, demanded that if he intended to retain his membership and to assert the invalidity or irregularity of the forfeiture of his membership, that he bring it, within a reasonable time, to the attention of the company. He could not sit idly by, apparently acquiescing in the forfeiture of his membership, while others were paying dues and large assessments, and, at the end of three years, have his beneficiaries placed in a better position than those of the members who had borne all of the burdens of the company. Glardon v. Supreme Lodge, 50 Mo. App. 58; Miller v. Grand Lodge, 72 Mo. App. 505; Purdy v. Life Assn., 101 Mo. App. 107; Lavin v. Grand Lodge, 112 Mo. App. 1; Bange v. Supreme Lodge, 128 Mo. App. 475; McGeehan v. Insurance Co., 131 Mo. App. 420; Stewart v. Supreme Council, 36 Mo. App. 333; Lone v. Ins. Co., 74 Pac. (Wash.) 689; State ex rel. v. Grand Lodge, 78 Mo. App. 556.

It is no answer to the defense of abandonment to say that an abortive effort had been made to forfeit his rights before he determined to quit the company. Glardon v. Supreme Lodge, 50 Mo. App. 1; Bange v. Supreme Lodge, 128 Mo. App. 475; Lavin v. Grand Lodge, 112 Mo. App. 1. The insured put his refusal to pay the assessments on the ground of the financial condition of the company, as he understood it, and because his policy was issued by the association under its original name which it subsequently changed. He never at any time set up or claimed that the assessments were invalid or brought any such objection to the attention of the defendant, its officers, agents or his fellow members, although he lived for more than three years after the assessments were made. It is too late for the plaintiff to set up a different ground

of objection to the assessments and one which the insured did not make for himself. Ins. Co. v. Burnham, 141 Fed. 842; Roth v. Ins. Co., 162 Fed. 284; Pfingston v. Grand Lodge, 83 N. E. (Ind.), 254.

*Lamb & Lamb* and *Busby Bros. & Withers* for respondent.

The act of making an assessment is a ministerial, and not a judicial one. Therefore no presumption can arise in favor of the regularity or legality of assessments, and it is an affirmative matter, both of pleading and evidence, necessary to establish a forfeiture for non-payment of an assessment; and the assessment should appear to have been made in the manner, mode and in conformity with the authority given, and for a proper purpose. 2 Joyce on Ins., sec. 1310; Stewart v. Grand Lodge, 46 S. W. 579; Murphy v. Fund Ass'n, 114 Fed. Rep. 404; Ins. Co. v. Hyde, 101 Tenn. 405; Benjamin v. Life Ass'n, 79 Pac. Rep. 517; Ins. Co. v. Geise, 49 Mo. 332; Miles v. Life Ass'n, 84 N. W. Rep. 159; Society v. Helburn, 85 Ky. 1; Burchard v. Travelers Ass'n, 139 Mo. App. 606. The question here is one of forfeiture and no liberal construction or intendment will be indulged in favor thereof. Bagley v. Grand Lodge, 131 Ill. 498; Sup. Council v. Haas, 116 Ill. App. 587; Hannum v. Waddill, 135 Mo. 160; McFarland v. Accident Ass'n, 124 Mo. 217; Seibert v. Chosen Friends, 23 Mo. App. 268; Grewell v. National Council, 104 S. W. 884; Ins. Co. v. Geise, 49 Mo. 329; Insurance Co. v. Comfort, 50 Miss. 662; Burchard v. Travelers Assn., 139 Mo. App. 606; Roseberry v. Benevolent Assn., 121 S. W. 785; 2 May on Ins. (4 Ed.), sec. 557; 2 Joyce on Ins., sec. 1310. The burden of proof was upon appellant to establish the alleged default by competent proof and to show that the assessment was regularly levied in accordance with its laws providing therefor. 3 Cooley's Ins. Briefs, 2348-2349; Assn. v. Schauss, 148 Ill. 304; Sup. Council v. Haas, 116 Ill. App. 587; Mulroy v. Knights of Honor, 28 Mo.

App. 463; Burchard v. Travelers Assn., supra. The assessment was not valid because there were sufficient funds on hand belonging to the death fund to not only pay in full the maximum loss of $5000, but to pay in full both losses for which said assessments were levied. Craig v. Indemnity Co., 136 Mo. App. 10; Ins. Co. v. Woolen Factory, 1 Ohio Dec. 577, 10 West L. J. 466. Proof that there was sufficient money belonging to the death fund on hand to avoid the necessity of a levy though concealed by having been wrongfully placed in another fund is such matter in rebuttal. Bagley v. Grand Lodge, 131 Ill. 498; Sup. Council v. Haas, 116 Ill. App. 587; Hannum v. Waddill, 135 Mo. 160; Craig v. Indemnity Co., 136 Mo. App. 5. The assessments not being valid because not "needed" a forfeiture cannot be based upon a failure to pay them. 3 Cooley's Ins. Briefs, 2348-2349; Craig v. Indemnity Co., supra. The defendant having fraudulently dissipated the funds of the insured and forfeited his policy in an oppressive, arbitrary and fraudulent manner, it was not incumbent on the insured to tender further premiums or attempt to be reinstated, when he had every reason to believe such action would be futile. Pilcher v. Insurance Co., 33 La. Ann. 222; Insurance Co. v. Smith, 44 Ohio St 156; Grand Lodge v. Scott, 93 N. W. 190; 2 Joyce, Insurance, 1123; Shaw v. Ins. Co., 69 N. Y. 286; Ins. Co. v. Ben. Soc., 181 Pa. St. 448; Agnew v. A. O. U. W., 17 Mo. App. 254; Insurance Co. v. Gorman, 74 Ga. 57. See, especially, 3 Cooley's Briefs on the Law of Insurance, 2330-2348. There was no evidence of a voluntary abandonment of the policy by the insured in this case. Wanek v. Supreme Lodge, 84 Mo. App. 185; Packwood v. Ins. Co., 9 Mo. App. 469; Ins. Co. v. Wright, 126 F. 82; 3 Cooley's Briefs, 2398; Ins. Co. v. Berwald, 76 S. W. 492. Mere silence on the part of the insured will not establish the fact of abandonment or acquiescence in an unlawful forfeiture. Guetzkow v. Insurance Co., 105 Wis. 448;

Purdy v. Life Assn., 101 Mo. App. 109; Smith v. Roach, 59 Mo. App. 117; Spurlock v. Sproule, 72 Mo. 509; Bostwick v. Fire Department, 49 Mich. 513; Lodge v. Hubbell, 2 Strob. L. (S. C.) 457; Thompson on Insurance, 931; 3 Cooley on Ins., 2398.

JOHNSON, J.—This is an action on a policy of life insurance issued by an insurance company organized under the laws of Illinois and authorized to do business in this state as an assessment company. The policy was issued to John H. Wayland of Salisbury, Missouri, June 24, 1889, who paid all dues and assessments until October 12, 1905, when he failed to pay two assessments (numbered 303 and 304) levied to pay two death losses of five thousand dollars each and thereupon defendant declared his policy forfeited. He made no effort to be reinstated, paid no further dues and assessments and on October 28, 1908, died at his home in Salisbury, leaving a widow and three children who were the beneficiaries named in the policy. Plaintiff is one of the beneficiaries and, on the refusal of defendant to acknowledge any liability under the policy, brought this suit, claiming the entire cause of action was vested in him by virtue of assignments to him by the other beneficiaries of their interests. When the policy was issued defendant was known as Knights Templers and Masons Life Indemnity Company but later its name was changed to Western Life Indemnity Company.

The following issues are presented by the pleadings and evidence: 1st. Were assessments 303 and 304 which the assured failed to pay legally levied and did the failure of the assured to pay them afford ground for the forfeiture of his rights under the policy? 2d. Did his failure to pay dues and assessments which accrued or were levied subsequently *ipso facto* work a forfeiture of the policy? 3d. Did the conduct

of the assured disclosed by the evidence constitute an abandonment of the policy?

All of these issues were resolved by the circuit court, where the case was tried without the aid of a jury, in favor of plaintiff, who recovered judgment for $5331.65, the face of the policy, with accrued interest and the cause is before us on the appeal of defendant. The two assessments in question were levied October 2, 1905, each was made for the avowed purpose of paying a specified death loss of $5000, Mr. Wayland was duly notified of the assessments and, under date of October 4th, he wrote defendant the following letter:

"Under the existing circumstances, is there no way in which I can pay the present assessment, to keep my policy in force, with the understanding that the money be returned to me if the company goes in the hands of a receiver, in which event I would not consider my policy worth a cent. I have nothing to show I have any claim in the Western Life Indemnity Company. My policy is issued by the K. T. & M. I. Co., and as a claim against the Western would not be of very much value, things look bad to me. Can you give me any assurance that the Western is O. K.?"

To this letter defendant replied October 9th, as follows:

"Receipt is acknowledged of your favor under date October 4. The Western Life Indemnity Company is identically the same company as the Knights Templars and Masons Life Indemnity Company, merely a change of name having been made, as provided by the statute, and for reasons set forth in the notice calling policy holders together last May for the purpose of considering the change.

Your careful attention is invited to the circular letter sent to our policy holders, which refers to this change and many other features which have been recently published in this company's affairs. I beg to assure you that everything contained in the circular

letter referred to is the absolute truth, and unless the efforts of a few misguided members acting under the advice of unscrupulous attorneys are successful in causing the ruin of a solvent organization, you need have no apprehension as to the future.

It is quite impossible to make any arrangements whereby the payments of premiums or assessments due can be held in escrow. This company is solvent, and doing business as usual, meeting every legitimate claim and paying same when due.

In order to maintain your insurance contract with this company it will be necessary for you to make remittances in due time, as provided in the notice sent you.''

Not hearing again from Mr. Wayland defendant, on October 16th, sent him the following notice:

''A notice of the last assessment, amounting to fifteen dollars, was mailed to you at the above address on the 2d day of October, 1905. This assessment still remains unpaid. Article 5, section 5 of the by-laws, as now in force, reads as follows:

### ARTICLE V.

Sec. 5. Any member who fails to pay or to forward the amount stated in any assessment notice to be due from him within ten (10) days after such notice is mailed to him, is *ipso facto* suspended from membership and from all the benefits arising therefrom; any member thus suspended from membership and benefits shall be reinstated *ipso facto* by the receipt of all amounts due from him at the company's home office in Chicago, while he is alive, within thirty (30) days after such notice was mailed, but the receipt of such a payment at said office from a suspended member after his death shall not affect a reinstatement, though it may have been forwarded prior to his death, and any member from whom such amounts due are not so received at said home office within thirty (30) days after such notice is mailed, *ipso facto,* terminates his

membership and all the benefits arising therefrom. The death of any member during his suspension from membership and benefits, terminates the right to reinstatement by payment of any amount due from him and absolutely defeats the right of any beneficiary or beneficiaries to recover any benefits from this company.

For this nonpayment you are now suspended and are carrying you own risk, but if the above amount is received at this office while you are alive, any time within thirty days after the 2d day of October, 1905, you will be thereby reinstated to membership.

Your attention is called to this as a matter of courtesy only, and we trust that you will attend to it at once. Kindly let us hear from you on receipt of this.''

This closed the correspondence. Mr. Wayland did not apply for reinstatement or pay any further dues or assessments and defendant regarded and treated his policy as forfeited as appears from the following evidence of defendant:

''Q. Was any notice given Mr. Wayland that there would be annual dues expected of him on the 24th day of June, 1906? A. I couldn't answer that definitely, but my impression is that there would not be any notice sent to him.

''Q. And why, Mr. Moulton? Why do you say that your impression is that there would not be any notice sent to him? A. For the reason that he had failed to pay assessments 303 and 304, which had been called on that policy.

''Q. Before that time? A. Before that time.

''Q. Then from your best information you would say no further notice was given with respect to annual dues? A. After Mr. Wayland's failure to pay assessments number 303 and 304, it is my belief that there were no notices extended after that date—after that failure to pay those assessments.

"Q. If they were sent it would be contrary to the whole conduct of the company would it not? A. Yes."

Pertinent provisions of defendant's constitution and by-laws thus were stated by Judge Goode in Craig v. Insurance Company, 136 Mo. App. l. c. 8, an action against the same defendant, similar in all essential features to the one in hand:

"The constitution and by-laws are a single instrument composed of different articles consecutively numbered, but not divided or designated separately by the two titles. Such portions of them as are relevant to the appeal will be epitomized. They require the board of directors to hold in trust the property, and assets of the company in accordance with their provisions (article 3, section 1). No member of the order may take out more than $5000 insurance. On receipt of proofs of the death of a member, an assessment must be levied on the surviving members at a rate increasing with their age, and according to a prescribed table of rates, except in the contingency provided for in the constitution as follows:

" 'No assessment shall be made for less than the above table of rates (i. e., one previously set out in the constitution) nor as long as the money in the death fund will pay the maximum loss in full.' If a member defaults in the payment of any assessment for sixty days after he is notified, the constitution says he shall be suspended, *ipso facto,* from membership and all benefits accruing therefrom, subject to certain opportunities for reinstatement (article 6, section 2). An annual due of one dollar for each thousand dollars of insurance is required on life policies (article 4, sections 3, 4 and 5). A death fund and a contingent fund are to be created in this manner; seventy-five per cent of all money accruing from assessments is to be placed to the credit of the death fund and used for no pur-

pose except paying death losses and disability claims. All other money accruing to the company must be placed in the contingent fund, out of which the expenses and 'emergencies' shall be paid and the surplus invested in the name of the company in reliable securities (article 8). It is apparent the contingent fund must include twenty-five per cent of the assessments, or the whole amount of them less the seventy-five per cent to be carried into the death fund, and include also the annual dues of one dollar for each thousand dollars of insurance. When a claim arises against the company in consequence of the death of a member, and is allowed by the directors, they are required to pay it in sixty days after receipt of satisfactory proofs of death, and there is this further proviso in the same connection; when the board of directors deems it expedient, the claim may be paid from the contingent fund 'as an emergency, before the collection of the assessment, if any, which may be levied for the payment of said policy; and in such case the proportion of such assessment which would go to the death fund, or as much thereof as is necessary, may be used to reimburse the contingent fund' (article 7). When the surplus or contingent fund exceeds one hundred thousand dollars, a member who has kept up his policy for ten years, shall receive a bond bearing three per cent interest for such portion of the surplus as the total sum paid by the member during the ten years bears to the total sum received by the company during said period (article 7, section 2). The constitution cannot be changed except at a regular meeting of the company and by a vote of three-fourths of the members present and voting.''

Plaintiff claims there was more than enough money in the death fund to pay the two death losses aggregating ten thousand dollars and, therefore, that the assessments in controversy were illegal because they were unnecessary, whilst defendant contends that

the death fund not only was deficient, but was over-drawn and indebted to other funds in the sum of $393,509.10.

It appears that in February, 1905, defendant bought the business of the Pennsylvania Insurance Company, an old line company, for which it paid a broker named Morgan $200,000. This payment was made—so defendant's books show—out of its contingent fund. From February to September 12, 1905, defendant collected premiums from the policy holders thus acquired (between 6000 and 7000) aggregating $99,104.20, and placed all such collections in its contingent fund. In the same period it paid death losses on "Pennsylvania" policies in the sum of $10,978.04, and these disbursements were paid out of defendant's death fund. Defendant claims that these losses though charged to the death fund, were paid out of the contingent fund, for the reason that the death fund was insolvent to the extent of about $400,000, but though defendant's president testified in its behalf, he gave no explanation or reason for the remarkable and, we might say, incredible state of affairs disclosed by the books.

It will be seen that the case in hand cannot be differentiated from that considered by the St. Louis Court of Appeals in Craig v. Insurance Co., supra, and we hold, as did our sister court, and for the same reasons, that the assessments for the non-payment of which defendant declared a forfeiture were illegal and void. As is well said by GOODE, J., "no forfeiture of the membership of the deceased could be worked for omitting to pay an illegal assessment. The right to assess is strictly construed and it can only be exercised when the conditions prescribed in the contract of insurance exist." [Insurance Co. v. Guse, 49 Mo. 329; Insurance Co. v. Comfort, 50 Miss. 662; 2 May on Insurance (4 Ed.), sec. 557; 2 Joyce on Insurance, 1310.]

The most serious question in the case is whether or not the conduct of the assured subsequent to the declaration of forfeiture by defendant amount to an abandonment of his policy.

"The test of an abandonment of rights under a life insurance policy is the existence of an intent to abandon and the presumption is that the owner of property intends to preserve his rights." [Manhattan Ins. Co. v. Wright, 126 Fed. 82; Life Ins. Co. v. Berwald, 76 S. W. 442; Packard v. Ins. Co., 9 Mo. App. 469.]

The fears expressed in the letter of the assured respecting the solvency of defendant and the request they prompted, in no sense were evidence of an intent to abandon any of the rights the assured then had nor did they recognize as legal what, in fact, was illegal. It appears quite clearly that the doubts of the assured were caused by the levy of assessment which subsequent investigation has shown were wrongfully levied and it is fair to presume that had defendant pursued a legal and just course with its policy holders and levied none but proper assessments, the assured would have performed his part of the contract as he had been doing for sixteen years. It must be borne in mind that the declaration of forfeiture was subsequent to the letter. After that declaration the assured remained silent and the real question for our determination is whether or not such silence, coupled with a failure to pay or tender payment of subsequent legal assessments, would indicate an intent in the assured to abandon his property.

Let us consider his position during the three years that elapsed from the date of the declaration of forfeiture to the date of his death. The notice of forfeiture he received apprised him of defendant's purpose to regard his contract as ended and his rights thereunder forfeited. As time went on he knew that other assessments were being levied and the omission

of defendant to give him notice of such assessments was, in effect, notice to him that defendant was continuing in its position that he was no longer a policy holder. He knew that an offer to pay legal assessments would be rejected unless he accompanied such offer with an offer to pay the illegal assessments and complied with the rules provided for the reinstatement of a forfeited policy. Certainly no one could have the temerity to argue that he was compelled to submit to unlawful exactions on pain of being treated as having abandoned his rights, and on what principle may it be said that he was required to tender payment of legal assessments that defendant admits would have been refused, or to bring suit to have his policy reinstated when, in fact, and in law, no forfeiture had occurred? The attempted exaction of an illegal assessment and the declaration of defendant that it would not continue in contractual relation with the assured except on his submission constituted a breach of the contract of insurance that relieved the assured of the obligation to pay or tender payment of subsequent lawful assessments as long as defendant persisted in its wrongful course. The true doctrine thus is expressed in Shaw v. Insurance Company, 69 N. Y. 286:

"Where one party to a contract declares to the other party to it, that he will not make the performance on the future day fixed by it therefor, and does not, before the time arrives for an act to be done by the other party, withdraw his declaration, the other party is excused from performance on his part, or offer to perform, and may maintain his action for a breach of the contract when the day has passed. Such is the well-established rule. [Ford v. Tiley, 6 B. C. 325; Franchot v. Leach, 5 Cow. 506; Traver v. Halsted, 23 Wend. 66.] In England the rule is carried much further, and it is held that the positive, absolute refusal by one party to carry out the contract is in itself an immediate complete breach of it on his part,

and dispenses the other party from the useless formality of tendering performance of the condition precedent, and gives immediate right of action. [Cort v. Abergate R. Co., 6 Eng. L. & Eq. 230; Hochster v. De La Tour, 20 Id. 157; Frost v. Knight, L. R., 7 Exch. 111.] And see, also, for the doctrine in this state, Burtis v. Thompson, 42 N. Y. 246; 1 Am. Rep. 516.] But we need not at present go further than the proposition first stated, and sustained by decisions in our own state reports. There is no doubt that the defendant repudiated all obligation to the plaintiff, and so declared to her it would have been a useless act for her after that to have sought the defendant and made offer to pay the annual premium. Nor need she, though the defendant had released future performance, act with effect until the death of her husband, the event which was contemplated by the contract as giving immediate right of action. It was then she sustained the injury which was the cause of damage to her, by the nonperformance by the defendant of their contract.''

Among the authorities to the same effect are the following: Heyer v. Ins. Co., 73 N. Y. 516; Guetznow v. Ins. Co., 105 Wis. 448; Pulling v. Ins. Co., 52 Ill. App. 452, 159 Ill. 603; Griesemer v. Insurance Co., 10 Wash. 202, 38 Pac. 1031; Sullivan v. Ben. Assn., 26 N. Y. S. 186; Pilcher v. Ins. Co., 33 La Ann. 222; Ins. Co. v. Smith, 42 O. St. 156; Grand Lodge v. Scott, 93 N. W. 190; 2 Joyce on Insurance, 1123; Ins. Co. v. Benefit Society, 181 Pa. 443; Agnew v. A. O. U. W., 17 Mo. App. 254; Ins. Co. v. Germany, 74 Ga. 57; 3 Cooley's Brief on Insurance, 2330; 3 Bacon on Benefit Societies & Life Ins., sec. 376; Reed v. Ins. Co., 82 N. E. 736; Hicks on Ins. Co., 96 S. W. 962; Ins. Co. v. Ins. Co., 86 Pa. St. 236; Benjamin v. Assn., 79 Pac. 517; Heinlein v. Ins. Co., 59 N. W. 615; Strauss v. Assn., 36 S. E. 352; Life Assn. v. Kentner, 58 N. E. 966; Hayner v. Ins. Co., 69 N. Y. 435.

It must be remembered that a life insurance policy is not a contract of indemnity but a contract to pay money upon the death of the assured in consideration of certain payments being made during his life (Reed v. Ins. Co., supra), and, therefore, it is a contract for life and not merely one for the period covered by the last periodical premium with the privilege of renewal. [Life Ins. Co. v. Statham, 93 U. S. 246.] The contract continues in force during the life of the assured and can be terminated before the event of his death and against his will only by a breach by him of some obligation or duty imposed on him by the terms of the contract. The insurer cannot make its own wrongful repudiation of the contract a ground of forfeiture nor can the mere passive, silent resistance of the insured to the unlawful aggression, be tortured into an abandonment of the policy. [Guetznow v. Insurance Co., supra; Purdy v. Assn., 101 Mo. App. 109; Smith v. Roach, 59 Mo. App. 115; and cases cited; Spurlock v. Sproule, 72 Mo. 1. c. 509; Bostwick v. Fire Department, 49 Mich. 513; 3 Cooley's Brief on Insurance, p. 2398.]

There is a line of decisions that on casual reading might be considered unfriendly to the rules we have stated and have shown to be so abundantly supported by authority, but a more careful consideration and analysis of these decisions discloses that they are not out of harmony with the great current of authority to which we have referred. They relate to cases where the assured evidently did abandon the policy and after his death his beneficiary attempted to rely, not on a wilful, illegal exaction of the assurer attempted to be forced on the assured in defiance of his lawful rights, but on some mere negligence or technical error with respect to the giving of some notice in conformity with the terms of the contract.

The courts very wisely refuse to recognize as sound a position resting on such an arbitrary and unfair foundation. The holder of an insurance policy,

knowing that premiums, and assessments will become
due periodically, has no right to sit down in silence,
fail to pay subsequent premiums and nurse the point
that by some slight oversight or mere technical error
the assurer has given him the right to hold his insur-
ance without paying for it. Such are the cases of In-
surance Co. v. Hill, 193 U. S. 551; Insurance Co. v.
Phinney, 178 U. S. 328; Insurance Co. v. Sears, 178
U. S. 345; Smith v. Ins. Co., 63 Fed. 769; McDonald
v. Grand Lodge,——Ky. Law, 883, 53 S. W. 282; Lane
v. Ins. Co., 33 Wash. 577.

The distinction between those cases and the one
in hand is obvious. In the one class the insurer was
guiltless of conscious wrongdoing and merely negli-
gent or mistakenly inaccurate in the performance of
some technical duty and the beneficiary of the lapsed
policy was attempting to take what the court in the
Hill case (supra) designated as "snap judgment." In
the case under consideration the assurer by levying
assessments that had no contractual or legal founda-
tion, deliberately violated the contract and then arbi-
trarily declared it forfeited because the assured would
not submit to the imposition. On what principle should
he be required to protest and to keep on protesting
against an injury of that character, or to tender lawful
assessments subsequently levied which the excessive
and high handed conduct of the assurer proclaimed
would not be accepted? Or why should he be required
to engage in expensive litigation to reinstate his pol-
icy—a contract for life—which had not been legally
forfeited and which he had performed until the breach
by defendant made further performance impossible?

We fail to find a single case in support of a doc-
trine so unfair and so violative of fundamantal prin-
ciples of contract law that would hold the assured re-
miss for standing on his contract in reliance on his
right to require the assurer to treat him fairly and
to perform its part of the contract. Our attention

has been called to the case of Ryan v. Life Assn., 96
Fed. 795. In that case the assured, disgusted at the
conduct of the assurer wrote a letter in which he ex-
pressly stated that he "had quit"— had abandoned
the policy. Of course a party to a contract which has
been breached by the other party may elect to termi-
nate the contract. That is a familiar rule of contract
law, but it has no application here for the reason that
Wayland did not make such election but merely re-
mained silent after he received notice of the forfeit-
ure.

And there is another class of cases to which we
are referred that are not in point. They relate to the
suspension or expulsion of members of fraternal ben-
eficiary societies, stock exchanges, guilds, etc. [Glar-
don v. Supreme Lodge, 50 Mo. App. 45; Miller v.
Grand Lodge, 72 Mo. App. 499; Lavin v. Grand Lodge,
112 Mo. App. 1; Range v. Supreme Council, 128 Mo.
App. 461; Kouter v. St. Louis Stock Exchange, 189
Mo. 26.]

A terse statement of the rule of such cases is that
a member of a lodge, fraternal society, or guild, should
exhaust the remedies offered him by the rules and
practices of the society for the correction of an injury
caused by a wrongful suspension or expulsion before
he resorts to the courts and, failing to avail himself
of such opportunity, will be held to have acquiesced in
his suspension or expulsion. Conceding, *arguendo,*
the soundness of this rule, it does not apply to old line
or assessment insurance where, as here, the so-called
member is a member only in name and has no oppor-
tunity of appealing to the legislative body of a dem-
ocratic organization for a redress of his wrongs. In
Lavin v. Grand Lodge, supra, Goode, J., observed the
difference in this respect between fraternal and old
line or assessment insurance. Speaking of decisions
relating to the latter classes of policies, he says:

"It is obvious such decisions have a very remote bearing on the question at issue in the present controversy. They were given in cases not against benevolent societies but where a company organized for profit was endeavoring to avail itself of *a default which it had caused*. The purpose of the present defendant is not profit but to provide for the families of deceased members; and there is nothing even tending to prove it would have refused to reinstate Lavin, or correct the blunder made against him, if he had sought redress. No motive for such a refusal appears."

But in a fraternal society where the injury is not the result of a mere blunder as in the Lavin case, but is clearly shown to be an intentional and wrongful aggression against the rights of the member, committed or ratified by the supreme power in the society, there is no reason in law or morals for compelling the injured member to go through the vain and useless form of obtaining redress in the society.

But it is suggested that it would be unjust to allow an assured whose policy had been wrongfully forfeited to sit idly by for, perhaps fifty years, without paying or offering to pay lawful premiums or assessments. But if the forfeiture has been caused by the intentional wrong of the assurer, or by its breach of the contract, of which it must have known, and it persists in its unlawful attitude, wherein lies the injustice of holding it to its contract?

It is a misconception of the rules we are applying to say they give the assured free insurance and, therefore, give him an advantage over paying members. In the first place, members who submit to unlawful exactions are not entitled to any special consideration on account of such complaisance, and in the next place, the law charges lawful premiums on assessments against the assured and his beneficiary must have them deducted from the benefit and may re-

cover only the difference.    [Reed v. Ins. Co., supra, and cases cited.]

This sufficiently answers the free insurance agent argument.   Our conclusion is that Wayland did not abandon his policy by  his mere failure  to protect against the forfeiture and his subsequent omission to tender payment of valid assessments.

We find no error in the rulings of the trial court on declarations of law asked by defendant and a careful inspection of the record convinces us that the issues were fairly tried.

The judgment is for the right party and is affirmed.

*Broaddus, P. J.,* concurs; *Ellison, J.,* dissents in separate opinion.

## DISSENTING OPINION.

In my opinion the trial court erred in its declarations of law which, practically cut out defendant's defense.   And so, in effect, it was declared by the court that there was no evidence tending to show an abandonment.   My views on that subject are expressed in a dissent filed in Johnson v. Hartford Life Ins. Co., this day decided.   As in that case, I deem the decision of the majority in conflict with Konta v. St. Louis Stock Exchange, 189 Mo. 26; and the following decisions of the St. Louis Court of Appeals.   [Glardon v. Supreme Lodge K. of P., 50 Mo. App. 45; Miller v. Grand Lodge, 72 Mo. App. 499; Lavin v. Grand Lodge A. O. U. W., 112 Mo. App. 1; Bange v. Supreme Council Legion of Honor, 128 Mo. App. 461.] The case should therefore be transferred to the Supreme Court for final determination.